UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS NAWROCKI et al.,

    Plaintiffs,

v.                                      Case No. 04-CV-74869-DT

CITY OF DEARBORN HEIGHTS et al.,

    Defendants.
                                     /

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

This case alleges excessive force resulting in the shooting death of Ronald Nawrocki. Pending before the court is Defendants' Motion for Summary Judgment. The motion has been fully briefed and the court held a hearing in the matter on November 9, 2005. For the reasons stated below, the court will grant Defendants' motion as to Defendant City of Dearborn Heights but deny the motion as to Defendant Officer Brian Mitchell.

**I. BACKGROUND**

Except where otherwise noted, the following facts are not disputed. On January 20, 2004, Ilona Nawrocki's thirty-nine year old son, Ronald Nawrocki, ("Decedent") was drinking alcohol in his bedroom in the home that the two of them shared at 26891 Northmore in Dearborn Heights, Michigan. Mrs. Nawrocki confronted the decedent about his drinking and later entered his room without his knowledge, removed an unopened bottle of vermouth, and poured it out in a downstairs bathroom. (Nawrocki Dep. at 246-47.) While Mrs. Nawrocki was in her bed, which was located in the living

room downstairs, the decedent came downstairs to confront her about the disposed alcohol. (*Id.* at 248.) In response, Mrs. Nawrocki told him that he could not have the bottle and informed him that the bottle was empty. (*Id.*) The decedent became angry and stated "how dare [she] tak[e] [his] bottle . . . and empty [it]." (*Id.* at 249.) The decedent's anger became physical, and he began hitting his mother on the top of her head with his open hand two to three times. (*Id.* at 250.) Mrs. Nawrocki called 911, hung up, and then gave the decedent the phone. (*Id.* at 254-55.) The 911 operator called the residence back and before the call terminated Mrs. Nawrocki said to the decedent in a voice loud enough to be heard by the operator, "Please don't hurt me anymore." (*Id.* at 257.) Mrs. Nawrocki at no time specifically requested that the police come to her home. (*Id.* at 258.)

The 911 operator, however, dispatched Defendant Officer Brian Mitchell to the residence on a report of "family trouble" and a statement that the residence had a "suicidal in November." (Defs.' Mot. at Ex. I.) Mrs. Nawrocki's version of certain disputed facts follows:

> When Officer Mitchell arrived at the residence, Mrs. Nawrocki was sitting with her dog on a futon [apparently her bed] and the decedent was upstairs. (Nawrocki Dep. at 258.) Officer Mitchell got out of his vehicle, approached the front door and entered. When Mitchell came into the home, he called to the decedent and informed him that the police were there. (*Id.* at 263.) The decedent then started down the stairs, while holding a closed pocketknife whose handle measured 2.5 inches "dangling between his [right] thumb and his [right] finger." (*Id.* at 283, 287.) The decedent then stopped on the landing of the stairwell and stood with his back against the wall (*Id.* at 264-65; 284.)[1] At all times the decedent was

---

[1]The stairwell consists of four steps elevated from the living area to an intermediate landing. (Defs.' Mot. at Ex. K.) After the landing, the stairwell turns 45 degrees with 8 stairs elevated from the landing to the second floor. (*Id.*)

2

standing totally erect and never raised his knife in a threatening manner toward the officer. (*Id.* at 286.) Mitchell then yelled at the decedent to "drop the knife" twice in rapid succession. (*Id.* at 289.) Mitchell then pulled his gun out and shot the decedent in his chest. (*Id.* at 290.) Neither she nor the decedent had an opportunity to speak before the decedent was shot because the event unfolded within seconds. (*Id.* at 290, 292.) At all times she was behind Mitchell and he stood between her and the decedent. (*Id.* at 291.)

Not surprisingly, Officer Mitchell's version of the events that transpired is considerably different from Mrs. Nawrocki's description. Mitchell avers that when he arrived at Mrs. Nawrocki's home, he peered through the front window and door, and saw an elderly female in the living area who appeared to be yelling to someone else in the residence. (Mitchell Aff. at ¶ 7.) He contends that the female opened the door and invited him in and informed him that the decedent had been drinking that day and that she poured out his alcohol, and as a result he became upset, assaulted her, and struck her in the back of the head and face. (*Id.* at ¶ 8.) According to Mitchell, she represented to him that she "attempted to call 911, but the decedent prevented her from calling, dismantled the phone, and retreated upstairs." (*Id.*) Mitchell claims that he called upstairs for the decedent and "asked him to come down and tell his side of the story," but there was no response. (*Id.* at ¶ 9.) He then contacted dispatch via his radio and informed them that the decedent was hiding again and that he would wait for another unit.[2] (*Id.* at ¶ 10.) He avers that as he waited downstairs with Ilona Nawrocki, he heard movement upstairs and footsteps as if someone were descending the stairs toward the living area. (*Id.* at ¶ 11.) He also heard someone exclaim "What?" (*Id.*) He

---

[2]Defendants have presented a photocopy of a dispatch log, which indicates that Mitchell called dispatch and stated "He's hiding again. I'm going to wait for another unit." (Defs.' Mot. at Ex. I.)

3

claims that he was "standing in front of the stairwell in the living area with [Mrs.] Nawrocki behind [him]. The decedent Nawrocki appeared on the landing, five steps above the living area. He was holding a black-handled knife in his right hand. His right hand was extended outward in [his] direction." (*Id.* at ¶ 12.) Mitchell then "removed his sidearm, ordered the decedent to drop the knife, and advised dispatch that the decedent was armed with a knife via [his] prep radio."[3] (*Id.* at ¶ 13.) Mitchell avers that he "again ordered the decedent . . . to drop the knife" and Mrs. Nawrocki also yelled for the decedent to drop the knife. (*Id.* at ¶ 14.) He asserts that Mrs. Nawrocki then moved to his right and he stepped in her path and she fell to the ground. (*Id.*) He claims that he again ordered the decedent to drop the knife, to which the decedent responded by saying "shoot me, shoot me." (*Id.* at ¶ 16.) Mitchell advised the decedent not to move one step closer, to which the decedent responded "put a hole in me." (*Id.*) According to Mitchell, the decedent moved forward as he descended the stairs in his direction, raised his knife, and lunged directly toward him. Mitchell fired one round from his weapon, striking the decedent in his chest. (*Id.* at ¶ 17.)[4]

Prior to this incident, officers from the Dearborn Heights Police Department visited the Nawrocki home at least 14 times relating to domestic violence calls, but the decedent had never confronted the police. (Defs.' Mot. at Ex. G.) Mitchell personally

---

[3]Defendants have presented a photocopy of a dispatch log, which indicates that Mitchell called dispatch and stated "Nine-two, radio. Get another car here. He's got a knife." (Defs.' Mot. at Ex. I.)

[4]Defendants have presented physical and forensic evidence that they argue demonstrates that the decedent bent or lunged toward Mitchell before he was shot. (Defs.' Mot. at Exs. M, O, and P.)

4

participated in two runs to the Nawrocki residence prior to January 20, 2004. (Mitchell Aff. at ¶ 5.)

On June 23, 2005, Plaintiffs Thomas Nawrocki, as Personal Representative for the Estate of the decedent Nawrocki, and Ilona Nawrocki, filed their First Amended Complaint, alleging gross negligence, violation of civil rights pursuant to 42 U.S.C. § 1983, assault and battery, and grossly negligent infliction of emotional distress. (Comp. at 4-10.) On December 14, 2005, Defendants timely removed the case to this court.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can

properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'"). A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party. *Dunigan v. Noble*, 390 F.3d 486,492 (6th Cir. 2004) ("[W]e must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'") The court does not weigh the evidence to determine the truth of the matter, but must determine if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## III.  DISCUSSION

### A.  Plaintiffs' Fourth Amendment Claim Against Defendant Mitchell[5]

Determining whether the force used to make a particular seizure is reasonable under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests."  *Graham*, 490 U.S. at 396.  In making this determination:

> Courts must apply an objective standard, looking to "the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether he was actively resisting arrest or attempting to evade arrest by flight."

*Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004) (quoting *Graham*, 490 U.S. at 396).  Additionally, evidence related to the severity of a plaintiff's injuries may be

---

[5]In their "Motion for Summary Judgment," Defendants argue that Plaintiffs have failed to state a constitutional cause of action against the City of Dearborn Heights.  In their response, Plaintiffs assert that they have "not pled a 42 U.S.C. § 1983 claim against the City of Dearborn Heights nor the Dearborn Heights Police Department." (Pls.' Resp. at 12; *see also* 5/26/05 stipulation dismissing Count II of Pls.' Compl. as to the City and the Police Department.)  Thus, the only claims asserted against Defendant City of Dearborn Heights are state law claims.  (*See* Pl.'s First Am. Compl. at 4-10.)  As for the City of Dearborn Heights Police Department, Plaintiffs presented as an exhibit to their 10/3/05 response to Defendants' motion, a "Stipulation Voluntarily Dismissing Defendant, Dearborn Heights Police Department, Only, Without Costs or Attorney Fees."  Although Plaintiffs never presented to the court a *signed* stipulation relating to their proposed order, the court notes that municipal departments are not independent legal entities which can sue or be sued in their own name.  *Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc.*, 32 F.3d 989, 991 n. 1 (6th Cir. 1994) ("Under the law of Michigan, a municipal police department is a creature of the municipality.  M.C.L.A. § 92.1 (West 1991).  A suit against a city police department in Michigan is one against the city itself, because the city is the real party in interest.") (citing *Moomey v. City of Holland*, 490 F.Supp. 188, 190 (W.D. Mich. 1980) and *Michonski v. City of Detroit*, 413 N.W.2d 438, 441 (Mich. Ct. App. 1987).)  Therefore, to the extent that Plaintiffs continue to assert any claims against the City of Dearborn Heights Police Department, Defendants' motion is granted as to the police department.

relevant in determining the amount of force used. *Martin v. Heideman*, 106 F.3d 1308, 1311-12 (6th Cir. 1997) (finding that it was error to limit "evidence of the severity of [Plaintiff's] injury," because the analysis of the "nature and quality of the intrusion" in *Graham* "must include consideration of the severity of any injury inflicted"). Courts assess the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, not after the fact with the benefit of 20/20 hindsight. *Graham*, 490 U.S. at 396. The court's reasonableness calculus allows "for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

The right to make a lawful seizure "carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Id.* Totally gratuitous uses of force, however, may be excessive. *Gaddis,* 364 F.3d at 772 (citing *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)). In addition, the subjective intentions of the officer involved are not relevant to whether the force used was reasonable. *Graham*, 490 U.S. at 397.

In *Tennessee v. Garner*, 471 U.S. 1 (1985), the *Garner* Court held that the use of deadly force is reasonable under the Fourth Amendment only if the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to officers or to others. *Garner*, 471 U.S. at 11; *see also Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991). "Only in rare instances may an officer seize a suspect by

use of deadly force." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (citation omitted).

In the instant case, when viewing the facts in a light most favorable to Plaintiffs, a reasonable jury could conclude that Defendant Mitchell exerted unreasonable force in his encounter with the decedent. According to Mrs. Nawrocki's recitation, the decedent (who was five feet, 3 inches tall and weighed 127 pounds) was in his second floor bedroom when Defendant Mitchell arrived at the residence. (Nawrocki Dep. at 251; Pls.' Resp. at Ex. 16.) Upon Mitchell's call to him, the decedent, while holding a *closed* pocketknife "dangling" between two of his fingers at his side, walked down the stairs in a depressed state and stopped on the landing, four steps above the first floor. (*Id.* at 263-64; 283.) Mitchell yelled "drop the knife" twice in rapid succession and immediately discharged a shot. The decedent did not lunge nor make any move toward Mitchell.[6] If these facts were credited, a reasonable jury could conclude that the decedent posed no present threat to either him nor Mrs. Nawrocki and that Mitchell used unreasonable force in shooting.

---

[6]The evidence indicates that Mitchell fired only one shot. Plaintiffs' "police practices expert," Donald Van Blaricom, testified that if an officer is facing a person armed with a knife, and that person charges toward him, the officer is trained to "shoot him until the gun ran out of bullets." (Blaricom Dep. at 118-19.) Defendants' expert, Dr. Robert Parson testified that he did not know why Mitchell did not follow his training and fire more than once if he believed that he was encountering deadly force and feared for his life. (Parson Dep. at 160-61.) In reciting this evidence, the court expresses no view as to whether "police practices" are legitimately the subject of expert testimony. *Berry v. City of Detroit* 25 F.3d 1342, 1352 (6th Cir. 1994) ("The danger [in declaring a witness to be an "expert in the field of proper police policies and practices"] is that there is no such "field" as "police policies and practices."); *Champion v. Outlook Nashville, Inc.* 380 F.3d 893, 908 (6th Cir. 2004) ("While 'police practices' in the broadest sense of the phrase may not be a field, surely criminology is.")

Defendants point to physical evidence that they say is so one-sided as to permit the court to engage in judicial fact-finding resulting in the discrediting of Mrs. Nawrocki's testimony. Defendants assert, for example, that the knife the decedent was holding was not the knife that Mrs. Nawrocki described, as the handle was black in color, rather than off-white as Mrs. Nawrocki described. (Mitchell Aff. at ¶ 12; Nawrocki Dep. at 286-87.) Defendants claim that it is indisputable that the downward angle of penetration of the single shot to the decedent conclusively shows that the decedent was lunging or at least bending noticeably toward Mitchell as the shot was fired. In addition, Defendants maintain that the independent physical evidence provided by the medical examiner proves without doubt that the core of Mrs. Nawrocki's testimony – that the decedent was standing still on the landing, some four feet above Mitchell, when he was shot – simply cannot be true. The physical evidence that Defendants presented is very detailed and Defendants have put forth an interpretation of that evidence that is well-suited to a presentation to a finder of fact. Even recognizing that a court, in some extraordinary circumstances, may be permitted to find that critical disputed testimony is utterly belied by objectively observable and undisputed physical facts, the court cannot find that this is such a case. This is true at least in part because the angle of penetration is not so decidedly downward as described in Defendants' briefing, and because the court thinks that a rational jury might be persuaded to an alternate conclusion concerning the position of the decedent's body at the moment of impact. The court must take into account Mrs. Nawrocki's claims that she witnessed acts by Officer Mitchell which, if true, would be inconsistent with the constitutional application of deadly force. Where a "plaintiff's version as to the nature and degree of force used is credited . . . a jury

question is created as to whether the force used was excessive." *Kain v. Nesbitt*, 156 F.3d 669, 673 (6th Cir. 1998). Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment claim will therefore be denied.

### B. Qualified Immunity as to Defendant Mitchell

Closely allied with Defendants' Fourth Amendment motion, explained above, is their claim that, even if a question of fact remains as to the existence of unreasonable force, Defendant Mitchell is in any event entitled to qualified immunity. Generally, public officials performing discretionary functions are entitled to qualified immunity and are protected from defending a § 1983 action when their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether qualified immunity attaches to an officer's conduct is a legal question, to be determined by the judge prior to trial. *Walton v. City of Southfield*, 995 F.2d 1331, 1335 (6th Cir. 1993).

Qualified immunity, when applicable, is not simply a defense to liability in the underlying case, but it provides immunity from suit altogether, shielding officials from the burdens of discovery and costs of trial. *Comstock*, 273 F.3d at 702 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The Sixth Circuit evaluates qualified immunity claims using a three-part inquiry. *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003); *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999). First, the court must determine whether the plaintiff has alleged facts, which taken in a light most favorable to him, show that the defendant-official's conduct violated a constitutionally protected right. *Toms*, 338 F.3d at 524. Second, if the first inquiry is answered in the affirmative, the court determines whether the right that was

violated was clearly established such that a reasonable official, at the time the act was committed, would have understood that his conduct violated that right. *Id.; Comstock*, 273 F.3d at 702 (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). Finally, the court determines whether the plaintiff has alleged sufficient facts and supported his allegations with sufficient evidence to indicated that what the official did was unreasonable in light of the clearly established constitutional right. *Toms*, 338 F.3d at 524.

When taking the facts in a light most favorable to Plaintiff and drawing reasonable inferences from the admissible evidence presented, a reasonable jury could determine that Mitchell's use of force did cross the "hazy border between excessive and acceptable force." *Saucier*, 533 U.S. at 206 (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926-27 (11th Cir. 2000)). Based on Plaintiffs' evidence, the decedent was standing completely still on the landing of a stairwell, above and four steps away from Mitchell, with one very small, closed pocketknife dangling from the fingers of his hand. Taking these facts as true, the decedent presented no serious threat to Mitchell when Mitchell shot him. Therefore, the use of deadly force was not objectively reasonable.

Second, the constitutional prohibition of deadly force used against non-threatening persons was a clearly established right that existed at the time decedent was shot.

Third, the court must determine whether the plaintiff offered sufficient evidence to indicate that what Mitchell is alleged to have done was objectively unreasonable in light of the clearly established constitutional rights. In this regard, Plaintiffs have presented Mrs. Nawrocki's eyewitness deposition that directly contradicts in important parts

Defendant Mitchell's testimony. When "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," the district court cannot grant a defendant police officer immunity from a deadly force claim. *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989). The question of qualified immunity turns on which versions of the events are accepted, Plaintiffs' or Defendants'. Mitchell's claim for qualified immunity must, at this stage of the proceedings, be denied.

### C. State Law Claims (Gross Negligence, Assault and Battery, Grossly Negligent Infliction of Emotional Distress) Against Defendant Officer Brian Mitchell

#### 1. Intoxication Defense

Defendants contend that Plaintiffs' state law claims against Defendant Mitchell are untenable because "Michigan law bars death and personal injury claims where the individual upon whom the action is based was 'impaired' by intoxicating liquor or controlled substance and 50% or more the cause of the 'accident or event' resulting in death or injury." (Defs.' Mot. at 3 (citing M.C.L. 600.2955a).)

Pursuant to M.C.L. 600.2955a:

> It is an absolute defense in an action for the death of an individual or for injury to a person or property that the individual upon whose death or injury the action is based had an impaired ability to function due to the influence of intoxicating liquor or a controlled substance, and as a result of that impaired ability, the individual was 50% or more the cause of the accident or event that resulted in the death or injury. If the individual described in this subsection was less than 50% the cause of the accident or event, an award of damages shall be reduced by that percentage.

M.C.L. § 2955a(1). Contrary to Defendants' position, in order to completely bar Plaintiffs' state law claims, the decedent would have to be at least 50% or more the cause of his death as a result of his impaired ability, not merely 50% or more at fault in a general sense. *Smith v. Pierce*, 2004 WL 2951889, at *2 (Mich. Ct. App. 2004).

13

Defendants have presented evidence that the decedent was intoxicated at the time of his death.  A toxicology analysis performed by the Wayne County Medical Examiner's Officer reported that he had a blood alcohol level of 0.17 percent, above the statutory definition of being presumptively "impaired," for purposes of operating a motor vehicle, at a concentration of 0.7 percent.  (Defs.' Mot. at Ex. U.); M.C.L. 257.625.  In addition, Defendants point to their expert, Dr. Ben Kuslikis, and Plaintiffs' expert, Dr. Werner Spitz, who analyzed the toxicology data and concluded that the decedent was intoxicated at the time of his death and that the intoxicating effects of the alcohol found in his body were exacerbated by his consumption of sedatives, anti-depressants, and antitussives.  (Defs.' Mot. at Exs. P and V.)  Defendants have argued generally the impact of the statute, but have not presented any evidence explaining how the decedent's alcohol impairment played an important, even decisive, role in his death.  Defendant Mitchell's defense on the basis of the decedent's intoxication does not entitle him to summary judgment on Plaintiffs' state law claims.  The jury may, of course, decide that the decedent's impairment is important in their evaluation of the facts, but the court cannot conclude as a matter of law that Defendant's intoxication was 50% or more the cause of his death.

### 2. Gross Negligence

Mitchell was acting in the scope of his employment as a Dearborn Heights police officer at the time that this incident occurred.  As such, he is immune from tort liability so long as his conduct did not rise to the level of gross negligence, as statutorily defined.  Mich. Comp. Laws § 691.1407(2).  Michigan law defines gross negligence as "conduct

so reckless as to demonstrate a substantial lack of concern for whether injury results." Mich. Comp. Laws § 691.1407(7)(a).

Based on the evidence described above and the court's excessive force analysis, there remains an issue of fact whether Mitchell's conduct rose to the level of gross negligence. If Mitchell acted as Mrs. Nawrocki described, his behavior amounts to conduct that was so reckless as to demonstrate a "substantial lack of concern" as to whether the decedent might die.

### 3. Assault and Battery Claim

An assault is defined as "any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991). A battery is the "wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Id.* at 21. In addition, the *Espinoza* court held that "the protection of the interest in freedom from unintentional and unpermitted contacts with the plaintiff's person extends to any part of his body or to anything which is attached to it and practically identified with it." *Id.*

Governmental actions which would normally constitute intentional torts are protected by governmental immunity if those actions are justified. Conversely, if the actions are not justified, they are not protected by governmental immunity. *Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984). In order to support a claim for assault and battery, the amount of force used must have been unlawful. Specifically, a

police officer may use reasonable force when making an arrest. *Id.*; *Delude v. Raasakka*, 215 N.W.2d 685, 688 (Mich. 1974); *People v. Krum*, 132 N.W.2d 69, 72 (Mich. 1965). "'The measure of necessary force is that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary.'" *Brewer,* 349 N.W.2d at 202.

In evaluating a claim of unreasonable force, the court notes that "police officers are employed to work in a 'milieu of criminal activity where every decision is fraught with uncertainty.'" *White v. Beasley*, 552 N.W.2d 1, 5 (Mich. 1996) (quoting *Ezell v. Cockrell*, 902 S.W.2d 394, 398 (Tenn. 1995). In addition, "a police officer making a lawful arrest may use that force that is reasonable in self-defense circumstances and is not required to retreat before a display of force by the adversary." *Alexander v. Riccinto*, 481 N.W.2d 6, 8 (Mich. Ct. App. 1991). Nonetheless, "the officer must have a reasonable belief of great danger before responding with the appropriate amount of force to foreclose the threat." *Id.*

In the instant case, Defendants contend that the decedent acted aggressively toward Mitchell. When taking the facts in a light most favorable to Plaintiffs, however, a reasonable jury could find that the decedent was standing still, and not being aggressive in his encounter with Mitchell. There remains a genuine issue of fact as to whether Mitchell's use of force was proper and, consequently, whether he can be held liable for assault and battery of the decedent.

### 4. Negligent Infliction of Emotional Distress

Defendants argue that "[t]he police shooting was constitutionally justified and under Michigan law, the officer was entitled to use the amount of force that was

objectively reasonable under the circumstance. Therefore, the shooting cannot formulate the basis for an intentional infliction of emotional distress claim."[7] (Defs.' Mot. at 18.)

In *Wargelin v. Sisters of Mercy Health Corp.*, 385 N.W.2d 732, 735 (Mich. Ct. App. 1986), the *Wargelin* court held that in order to establish a negligent infliction of emotional distress claim:

> (1) the injury threatened or inflicted on the third person must be a serious one, of a nature to cause severe mental disturbance to the plaintiff;
> (2) the shock must result in actual physical harm;
> (3) the plaintiff must be a member of the immediate family, or at least a parent, child, husband or wife; and
> (4) the plaintiff must actually be present at the time of the accident or at least suffer shock "fairly contemporaneous" with the accident.

*Wargelin*, 385 N.W.2d at 735. In the instant case, the first, third, and fourth prongs can be established through Mrs. Nawrocki's testimony that she witnessed her son being shot and killed by Mitchell. In addition, Plaintiffs have presented evidence to satisfy the second prong in that Mrs. Nawrocki suffered a bout of depression as a result of the death of her son, developed ulcers and experienced a heart condition. (Nawrocki Dep. at 310-13.) The court will deny Defendants' summary judgment on Plaintiffs' negligent infliction of emotional distress claim.

### D.  State Law Claims (Gross Negligence, Assault and Battery, Grossly Negligent Infliction of Emotional Distress) Against Defendant City of Dearborn Heights

Finally, Defendants claim that the City of Dearborn Heights is entitled to governmental immunity from tort liability on Plaintiff's state law claims. Pursuant to

---

[7]Defendants refer to Plaintiffs' claim as an "intentional" infliction of emotional distress claim. Plaintiffs plead it as "negligent" infliction of emotional distress. (Compl. at ¶ 8.)

M.C.L. 691.1407(1):

> Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function.

M.C.L. 691.1407(1). A "governmental function" is:

> [A]n activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law. Governmental function includes an activity, as directed or assigned by his or her public employer for the purpose of public safety, performed on public or private property by a sworn law enforcement officer within the scope of the law enforcement officer's authority.

M.C.L. 691.1401(f). "It is well-settled that the management, operation and control of a police department is a governmental function." *Moore v. City of Detroit*, 340 N.W.2d 640, 643 (Mich. Ct. App. 1983). Indeed, "arrest, detention, and prosecution activities . . . are clearly governmental functions entitled to immunity." *Kahlich v. City of Grosse Pointe Farms*, 120 Fed. Appx. 580, 585 (6th Cir. January 10, 2005) (citing *Payton v. City of Detroit*, 536 N.W.2d 233, 241-42 (Mich. Ct. App. 1995).

Plaintiff argues, however, that "a governmental entity would not be immune from intentional torts committed by a governmental employee outside the exercise of a governmental function." (Pl.'s Resp. at 20.) The court disagrees. There is "no exception to governmental immunity for intentional torts." *Kahlich*, 120 Fed. Appx. at 585. The Michigan Court of Appeals has explained that:

> The immunity granted by the statute to a municipality is based upon the general nature of the activity of its employees, rather than the specific conduct of its employees. (citing *Smith v. Dep't of Public Health*, 428 Mich. 540, 608, 410 N.W.2d 749 (1987), aff'd sub nom *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).) As the *Smith* Court noted, "to use anything other than the general activity standard would all but subvert the broad governmental immunity intended by the Legislature. . . . [I]t would be difficult to envision a tortious

act that is a governmental function." (citing *Smith*, supra at 609, 410 N.W.2d 749.)

*Payton*, 536 N.W.2d at 241. Therefore, the court finds that Defendant City of Dearborn Heights was engaged in a "governmental function" under M.C.L. 691.1401(f), and is entitled to immunity unless Plaintiffs have pled a statutory exception to the City's immunity.[8] Plaintiffs' complaint does not specifically plead any statutory exception to the application of M.C.L. 691.1407(1), nor have Plaintiffs asserted any exception in response to Defendants' motion for summary judgment. The court finds that the facts of this case, viewed in a light most favorable to Plaintiffs, fall squarely within the limits of governmental immunity. Therefore, the court will grant Defendants' motion as to Defendant City of Dearborn Heights.

## IV. CONCLUSION

IT IS ORDERED that Defendants' "Motion for Summary Judgment" [Dkt. # 39] is GRANTED IN PART and DENIED IN PART. Defendants' motion is GRANTED as to Defendant City of Dearborn Heights and Defendant City of Dearborn Heights Police Department and DENIED as to Defendant Officer Brian Mitchell.

                                              S/Robert H. Cleland
                                              ROBERT H. CLELAND
                                              UNITED STATES DISTRICT JUDGE

---

[8] The *Ross v. Consumer's Power Co.*, 363 N.W.2d 641 (1984) court held that to avoid the application of governmental immunity, a plaintiff must state a cause of action "arising out of the failure to keep highways in reasonable repair (M.C.L. § 691.1402; M.S.A. § 3.996[102]); negligent operation of a government-owned motor vehicle by an officer, agent, or employee (M.C.L. § 691.1405; M.S.A. § 3.996[105]); and dangerous or defective conditions in public buildings under the agency's control (M.C.L. § 691.1406; M.S.A. § 3.996[106])." *Id.* at 647.

Dated: December 29, 2005

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, December 29, 2005 by electronic and/or ordinary mail.

                              S/Lisa Wagner
                              Case Manager and Deputy Clerk
                              (313) 234-5522